PARKER v. THE HANNIBAL & ST. JOSEPH RAILROAD COMPANY, *Appellant.*

IN BANC.

**Negligence:** FELLOW-SERVANT: RAILROAD. Railroad section hands, engaged in ballasting the railroad track with stone, which is hauled to them on a construction train, and is unloaded by the trainmen, are not fellow-servants with the trainmen, where the two groups are independent of each other and work under different foremen, to whose orders they are respectively subject. [SHERWOOD, C. J., GANTT and MACFARLANE, JJ., *dissenting.*]

*Appeal from Jackson Circuit Court.*—HON. T. A. GILL, Judge.

REVERSED AND REMANDED.

*Strong & Mosman* for appellant.

(1) The plaintiff failed to establish by evidence that the servants of the defendant running and managing the construction train failed to warn the men at work on its track of the approach of the train, as

charged in the petition. The only evidence produced was the negative statement of men who were not expecting a train, and whose attention was engrossed in their labor. It was not sufficient to entitle the plaintiff to go to the jury. *Cathcart v. Railroad*, 19 Mo. App. 118; Thompson on Trials, sec. 391, p. 349. (2) Whatever may be the weight accorded to this evidence, it was entirely overthrown by the evidence of the defendant. *Kinzey v. Railroad*, 76 Mo. 638; *Bohan v. Railroad*, 61 Wis. 391; *Culhane v. Railroad*, 60 N. Y. 137; *Railroad v. Manley*, 58 Ill. 309. (3) As to the charge of negligence contained in the petition, in respect to the train being run backwards, there is not the slightest evidence to sustain the charge. It appears that the train was moving at its usual speed, with men stationed on the forward end of the leading car to warn persons from the track. A railway company certainly cannot, as to its own employes, be held negligent in backing a train over its track under such circumstances; and in this case this very train had been run backwards over this very track, at this same hour, to plaintiff's knowledge, daily for two weeks. (4) There was a total failure of evidence tending to show that there was any negligence or recklessness in respect to the rate of speed at which the train was moving. None of plaintiff's witnesses were shown to be competent to testify on that point. A railroad company has the right, as regards others than passengers, to fix its own rate of speed in the absence of any law or ordinance limiting it. *Maher v. Railroad*, 64 Mo. 267; *Stevens v. Railroad*, 86 Mo. 226; *Goodwin v. Railroad*, 75 Mo. 75; *Railroad v. Huntley*, 38 Mich. 537. (5) The plaintiff was guilty of such contributory negligence as barred his right to recover. *Price v. Railroad*, 77 Mo. 508; *Steffen v. Mayor*, 96 Mo. 420; *Waldhier v. Railroad*, 87

Mo. 37; *Renfro v. Railroad*, 86 Mo. 302; *Gleason v. Excelsior Co.*, 94 Mo. 205; *Spiva v. Railroad*, 88 Mo. 73, 74. (6) It was error for the court to refuse instruction, numbered 5, asked by the defendant, to the effect that if deceased came to his death by reason of the negligence of defendant's employes in charge of the rock or construction train, in running and managing the same, the verdict should be for defendant. *Blessing v. Railroad*, 77 Mo. 412; Shearman & Redfield on Negligence, secs. 225, 234, 235, 236, 241; Bishop on Non-Contractual Law, secs. 662, 669, 673; *Evans v. Railroad*, 62 Mo. 49; *Gibson v. Railroad*, 46 Mo. 169; *McDermott v. Railroad*, 30 Mo. 115; *Marshall v. Schricker*, 63 Mo. 311; *Rohback v. Railroad*, 43 Mo. 187.

*T. T. Crittenden, E. H. Stiles* and *J. F. Waters* for respondent.

(1) Plaintiff's husband, a section hand, was not a fellow-servant, within the rule with the engineer of the train which killed him, for the reason that they were in different departments of the service. *Railroad v. Weaver*, 35 Kan. 412; *Garrety v. Railroad*, 25 Fed. Rep. 258; *Calvin v. Railroad*, 23 S. C. 536; *Sullivan v. Railroad*, 97 Mo. 113. Nor can the rule be held otherwise without directly overruling the case last cited. (2) The foregoing cases are almost exactly in point. As bearing, however, on the point and to the same conclusion, we cite the following: A conductor of a train is not a fellow-servant with the engineer or fireman. *Railroad v. Ross*, 112 U. S. A conductor of one train is not a fellow-servant with the brakeman of another train. *Au, Adm'x, v. Railroad*, 29 Fed. Rep. 72. A conductor of a railroad train is not a fellow-servant of the trainmen. *Moon's Adm'r v. Railroad*, 78 Va.

745; s. c., 49 Am. Rep. 401." A conductor of a material train is not a fellow-servant with a laborer on the train even in adjusting the switch." *Coleman v. Railroad*, 25 S. C. 446; s. c., 60 Am. Rep. 516. The conductor of a freight train is not a co-servant within the rule with the engineer of another train, and the defendant is liable where the accident was caused by the negligence of those in charge of the freight train. *Railroad v. Ackley*, 8 S. W. Rep. (Ky.) 691. The engineer of one freight train is not a co-servant within the rule with the conductor of another freight train through whose negligence a collision occurs, killing the engineer of the other train. *Railroad v. Cavin's Adm'x*, 9 Bush (Ky.) 559. "The brakeman and section foreman are not co-servants within the rule." *Lewis v. Railroad*, 59 Mo. 495. Section foreman and switchman are not such servants. *Hall v. Railroad*, 74 Mo. 298. Track laborer and fireman are not such fellow-servants. *Coles v. Railroad*, 84 N. C. 309. Brakeman and roadmaster are not such fellow-servants. *Railroad v. Moore*, 39 Kan. 197. Night watchman and foreman of crew are not such fellow-servants. 110 Ill. 383. Car inspector and brakeman are not. *Condon v. Railroad*, 78 Mo. 567; *Long v. Railroad*, 65 Mo. 225. Foreman of car repairs is not a fellow-servant with a workman under him. *Moore v. Railroad*, 85 Mo. 588. Section foreman and the workman under him are not such fellow-servants. *McDermott v. Railroad*, 87 Mo. 285, following *Moore v. Railroad*, *supra*. Hostler of engine roundhouse and person employed therein are not fellow-servants. *Dayharsh v. Railroad*, 15 S. W. Rep. 554.

GANTT, J.—The plaintiff, as the widow of William C. Parker, commenced this action December 2, 1886, against the defendant to recover damages sus-

tained by her by reason of the death of her husband, who was killed by a construction train on defendant's track, near Randolph Bluff, on the twenty-sixth day of October, 1886.

Plaintiff's husband had been engaged as a section hand or track laborer for the defendant for about two years prior to his death. On the twenty-sixth of October, 1886, he was engaged at work on defendant's track at a place called Randolph Bluff with the rest of the section men, and had been working at that point every day for about two weeks prior to his death; the train which struck him was a construction train engaged in carrying rock from the rock crusher at Minnaville, five miles east of Randolph Bluff, to a point near the Bluff, and west of where the section men were working, for the purpose of ballasting the track and had been thus engaged daily for three months. The engine of the construction train pulled the cars after it going west, and returning east pushed the cars in front of it. It made the round trips past the place where the section men were at work upon the track daily, the last trip being about five o'clock in the afternoon, each day.

It was while this train was running eastward on the twenty-sixth of October, 1886, at five o'clock P. M., that it struck William Parker, plaintiff's husband, and killed him. From the evidence, there were about twenty-five passenger and freight trains running daily over that part of the track where Parker was killed, during the daytime.

The evidence discloses that at the time of the accident which resulted in Parker's death the train had discharged its stone, and was being run, caboose in front, eastward, to Minnaville; Parker was working on defendant's track, tamping some rock under the track, with his face to the east and back to the west. On the part of the plaintiff several witnesses testified, *in o*

*negative way*, that the train made no signals, either by blowing the whistle or ringing the bell; that some one hundred and fifty yards west of the point where plaintiff's husband was at work there was a curve in defendant's track; that parallel with defendant's track was the Wabash railroad track, and distant at this point about nine feet, one from the other. On the part of the defendant there was much positive affirmative evidence that at a point some two thousand feet west of where Parker. was killed the engineer blew three blasts of the whistle, as a signal that he was going to back over this track with his train.

There was also evidence that just at the time plaintiff's husband was struck and killed a freight train of forty-eight cars on the Wabash was running eastward by this place, making much noise. A number of witnesses were allowed without being qualified as experts or showing any familiarity with the speed of trains to testify that, in their opinion, the train was running thirty to thirty-five miles an hour and was racing with the Wabash train. On the part of defendant there was positive testimony that just west of the point where Parker was killed, there was a curve in the track, and that while going round this curve the engine blew four blasts of the whistle, two long and two short.

It appears from the evidence that on the east or front end of the construction train as it backed east two men were stationed, one with a flag; the train was running backwards at a rate variously estimated from fifteen to thirty-five miles per hour, at the time it struck Parker. From the point where Parker was at work the track could be seen westward a distance variously estimated by plaintiff's witnesses as being from one hundred and fifty yards to a quarter of a mile; that all the other men composing the gang of section men were west, and within sixty feet of the point where

Parker was working, being between him and the approaching train, scattered along the track at work; that the section foreman, Hudgens, noticed the approach of the train and called out to his men to get off the track; seeing that Parker was standing over the north rail of the track busy at work with his back to the approaching train, without heeding the warning, the foreman, Joseph Dawson and Prince L. Hudgens all three started and ran towards him, yelling as loud as they could for him to get off the track, one of them, Dawson, running some forty or forty-five feet towards Parker before he was struck. In addition to this, the men on the front end of the leading car of the train hallooed with all their might, but failed to attract his attention in time to prevent the train striking him.

It seems very probable that the noise made by the Wabash train passing at the time prevented the deceased hearing these warnings. The negligence complained of is the excessive speed of the train; the fact that it was *backing over the track;* the failure of the trainmen to give signals to the trackmen at work on the track, and the racing with the Wabash.

The defense is that there was no negligence; that as to trackmen the company did not owe them the duty of whistling and ringing the bell; that this work had been going on daily for three months over this same track, and this same train passed daily at the very hour plaintiff's husband was struck; that Parker and the other section men had been for two weeks at this point ballasting the track and repairing it, and had every reason to expect this train at that time; that, while it was an irregular train in one sense, yet at this time it made quite regular trips twice a day; that the speed made was necessary to permit this train to clear the track for the regular passenger train, and that if

Parker v. The Hannibal & St. J. Ry. Co.

negligence it was that of fellow-servants in charge of the construction train who were engaged in the same common employment for the same common master at that time and the contributory negligence of plaintiff's husband.

Upon request of plaintiff the court gave the jury the following instructions, to the giving of which the defendant objected at the time and excepted: "1. The plaintiff in this action seeks to recover of defendant $5,000 damages for the killing of her husband while he was at work as a section hand upon the defendant's railroad, by one of defendant's construction trains; and her right to recover is based upon alleged negligence of the servants and agents of defendant, in the running and management of the train in question. The defendant railroad company, by its answer, admits that plaintiff's husband was killed while in its employ, but denies the negligence charged by plaintiff, and in substance alleges that the death of plaintiff's husband was occasioned solely by his own carelessness and recklessness, and without any fault or neglect of defendant's agents or servants contributing thereto. The questions for you to determine under the issues thus made and the evidence and the instructions of the court are: *First.* Did the agents and servants of defendant in charge of the train in question run and manage said train in a negligent, careless manner? If so, was the injury to, and death of, plaintiff's husband caused thereby?

"If the plaintiff has satisfied you by a preponderance of the evidence that these questions should be answered in the affirmative, then you will find a verdict in her favor, unless the defendant railroad company has satisfied you, by a preponderance of the evidence, that the plaintiff's husband was at the time guilty of carelessness, recklessness or negligence, and that such want

of due and proper care upon his part directly contributed to his death. These questions it is your duty to determine under all the facts and circumstances in proof.

"2. The degree of necessary, usual and proper precautions to secure his own safety, to which plaintiff's husband was held, as a section hand upon defendant's railroad, was such care, caution and diligence only as a man of ordinary prudence should have exercised in the same situation, under the facts and circumstances in proof.

"3. If the jury find from the evidence that there was a sharp curve in defendant's track a short distance west of the point at which plaintiff's husband was killed; that it was the custom of defendant's railroad, known to its employes, to give notice of the approach of its trains by ringing the bell or sounding the whistle when running its trains around its curve on its track, then it was the duty of the agents and servants of defendant, in charge of said train, to give such signals in this instance.

"4. If the jury find from the evidence that the agents and servants of defendant in charge of the construction train in question were running said train backward; that they were engaged in a race with a train of cars on the Wabash, St. Louis & Pacific railway, which at that point runs parallel with and near to defendant's track; that they were running said construction train at such a high rate of speed, and in such a manner as to endanger the lives of employes upon its track; that they knew, or by the exercise of ordinary care upon their part might have known, that plaintiff's husband and his colaborers upon the track were at or near the point where the accident occurred, and did not ring the bell or sound the whistle as they came around the curve, or approach the same, so as to give warning

of their approach, and failed to use the ordinary means within their power to prevent the injury to and death of plaintiff's husband, then the defendant was guilty of negligence in so running and operating its train, and if the jury find that plaintiff's husband was without fault or negligence upon his part, and that such negligence on the part of the servants and agents of defendant in running and managing said train caused his death, then you should find a verdict for the plaintiff.

" 5. Although the jury may believe from the evidence that the noise made by the running of the train upon the track of the Wabash, St. Louis & Pacific railway was so great as to render it difficult for plaintiff's husband, while engaged in his work upon defendant's track, to hear the approach of defendant's train, yet that fact alone did not absolve the defendant from its obligation to use the usual and proper precautions to warn plaintiff's husband of his danger; and if the jury find that plaintiff's husband was standing with his back towards the approaching construction train; that it was necessary for him to stand in that position in order for him to do the work upon which he was at that moment engaged; that the servants and agents of defendant in charge of their train, and the deceased, had the same means of knowing that the noise made by the other train rendered it difficult for plaintiff's husband to hear the approach of the train that struck and killed him; that plaintiff's husband had no notice or warning of the approach of said train, and that without fault or neglect on his part he was struck and killed by said train, on account of the negligence of defendant's agents and servants having the charge thereof, in failing to ring the bell or sound the whistle, or giving other warning likely to be seen or heard by an ordinarily prudent person there engaged, and in running said train backward at a high rate of speed

without notice or warning, which they might have given by the exercise of ordinary care upon their part, the jury should find for the plaintiff.

"6. If the jury find for the plaintiff they will assess her damages at the sum of $5,000."

The court on its own motion gave the following instructions, viz.: "1. The defendant's servants engaged in running and operating the construction train mentioned in evidence were not guilty of negligence in failing to anticipate that the section men engaged at work on the track would fail to be reasonably watchful, and upon the alert to ascertain that said train was approaching. In other words, the defendant's servants running said train had the right to assume that the said section men would be in the exercise of that degree of care which would be exercised by ordinarily prudent persons under the same or similar circumstances:

"2. Defendant had a lawful right to run its trains upon the track at the place where the injury occurred, either forward or backwards, and the fact that said train was being run at said time with the engine in the rear of the flat cars does not of itself constitute any negligence on the part of the defendant, or on the part of those in charge of said construction train."

To the giving of which instructions the defendant then objected and excepted, and still excepts.

The court gave the following instructions at the instance and request of defendant: "7. The court instructs the jury that in the transaction of its business, and in the operation of its railroad, the defendant has a lawful right to run its trains at any rate of speed it may deem convenient and necessary, and, although the jury may believe from the evidence that the defendant's train was at the time and place mentioned running at a

rapid rate of speed, yet that fact alone did not constitute negligence on the part of the defendant."

"10.   The jury are instructed that, if they find from the evidence that the accident to the said William Parker was the result of the combined negligence of both the said Parker and of the men in charge of the construction train, the verdict must be for the defendant."

"12.   The plaintiff does not charge that the servants of the defendant running the rock train were guilty of any negligence:   *First*, in respect to the efforts made by them to stop said train after discovering the position and danger of William Parker, or, *second*, that said servants failed to discover the position and danger of the said William Parker as soon as they should, or, *third*, that said servants were negligent in any respect after they became aware of his position and danger. And, in the consideration of your verdict, you will disregard all evidence, if any there be, on these points, as plaintiff must recover on the case made in the pleadings."

"*b*.   Although the jury may believe that in some regards the defendant was negligent, yet if they further believe from the evidence that deceased by the exercise of ordinary prudence and caution could have avoided the accident, they must find for the defendant."

The defendant prayed, and the court refused, the following instructions, and defendant at the time excepted to the action of the court in refusing the same:   "1.   The defendant moves the court to instruct the jury that, under the pleadings and the evidence in this case, your verdict must be for the defendant. *First*.   Because deceased was a fellow-servant of the men engaged in running the train by whose negligence it is alleged he was injured.   *Second*.   Because the said

William Parker was guilty of negligence directly contributing to the injury.

"2. The court instructs the jury that there is no evidence that the train was being run at an improper or dangerous rate of speed at the time and place of the accident.

"3. The court instructs the jury that there is no evidence that the defendant's servants were guilty of any negligence in running the construction train backwards over defendant's track.

"4. There is no evidence tending to show that defendant's servants in charge of said train failed and neglected to sound the whistle upon said engine before starting around the curve near the point of the accident.

"5. The jury are instructed that if they believe from the evidence that the deceased, William Parker, came to his death by reason of the negligence of the employes of defendant in charge of the rock or construction train, in the running and management of the same, they will find for defendant.

"6. The defendant's servants engaged in running and operating the construction train mentioned in evidence were not guilty of negligence in failing to anticipate that the section men engaged at work on the track would fail to be watchful and upon the alert, to ascertain that said train was approaching."

"8. The court instructs the jury that it was the duty of William Parker, while in and upon the defendant's track at work, to be constantly on the alert and watchful that he might ascertain whether trains were approaching over the same, in time to avoid danger from the same. He had no right to rely upon being notified by the men in charge of the train of his danger, but was in duty bound, while thus in and upon the track at work, to use every precaution to learn of the

approach of trains and avoid danger, that a careful prudent man would have used under similar circumstances.

"9.   The court instructs the jury that, under the evidence in this case, the section men, including the deceased, engaged in work on defendant's tracks, were bound to expect an irregular train from the west at any moment; and if you believe from the evidence in this case that the curve in defendant's track, and the high bluff on the north side, rendered it impossible to see any considerable distance westward along said track from the point where the deceased stood, and that by reason of the noise made by the freight train on the Wabash track, it was impossible or difficult to hear an approaching train on defendant's track, or signals made by such train; and that the said William Parker, with a knowledge of these facts, placed himself astride of one of the rails of defendant's track, with his face to the east, and continued in this position, engaged himself in the work of tamping stone under a tie, without keeping a watch to the west, or taking any precautions to ascertain whether any train was approaching him from that direction, your verdict must be for the defendant."

"11.   Defendant had the lawful right to run its trains upon the track at the place the injury occurred, either forward or backward, and the fact that said train was being run at said time with the engine in the rear of the flat cars does not constitute any negligence on the part of the defendant, or on the part of those in charge of said construction train."

"a.   If the jury believe from the evidence that in consequence of the curve in the defendant's track it was impossible for a person to see any considerable distance along the same; that the noise and roar of the freight train running on the Wabash track made it difficult or impossible to hear the noise or the signals

of a train approaching upon the defendant's road at the time of the accident, and you further find that the section men, including the said Parker, knew or had reasonable grounds to expect that the construction train would come along over the track going east at about the time said train did in fact come along, and that the said William Parker, with a knowledge of all these facts, went between the rails of defendant's track and continued to work with his back to the approaching train, and without taking any precautions to ascertain the approach of the same, your verdict must be for the defendant."

"*c*. If the jury find from the evidence that the servants of the defendant running the train, in proof, sounded the signal whistle just before starting their train around said curve, then the court instructs you that the defendant's servants in charge of the train had the right to believe that the section men would hear and heed said warning, and if you find from the evidence that a man was stationed on the front end of the train as it moved east to warn persons off the track, then such servants so in charge of said train were not negligent in respect to the rate of speed at which said train ran, and the finding should be for the defendant."

The court, at the request of plaintiff and against the objection of the defendant, allowed the jury to take to the jury room with them, after the case was submitted for consideration of their verdict, and while considering of the same, the plat or picture spoken of in the evidence and shown in evidence by plaintiff.

To this ruling and action of the court the defendant then excepted, and still excepts.

The jury returned a verdict for plaintiff in the sum of $5,000, and judgment was rendered thereon by the

court, to which action of the court the defendant then excepted and still excepts.

Plaintiff's husband was a section hand in the service of defendant at the time he was killed. He had been in this same employment for about two years prior to his death. At the time of his death, he was tamping rock under the head block at the switch, near Randolph Bluff, stooping, with his back toward the west. He was struck by a car in a construction train coming from the west, on defendant's track, in charge of defendant's trainmen, who were and had been for some three months engaged in hauling and unloading crushed rock for ballast for this section. The train had discharged its load of rock, and was backing, caboose in front, to Minnaville, some five miles distant, in order to clear the track for the afternoon passenger train.

Just at the time plaintiff's husband, William C. Parker, was struck, a freight train of forty-eight cars was passing on the track of the Wabash railroad, about nine feet distant, and at this point parallel to defendant's road. The Wabash train was making a great noise. The evidence for the plaintiff was that Parker and his associate section men did not hear any signals by way of bell-ringing or whistle-blowing on the part of those in charge of the construction train. On the part of the trainmen, there was much positive evidence that just prior to starting the train back on the main track the engineer sounded his whistle. About one hundred and fifty yards west of the point where Parker was struck there was a curve in defendant's road. The engineer and other trainmen testify that when nearing this curve the engineer gave four signals, two long and two short blasts of the whistle. All the section men except Parker saw the train in time to avoid it, and did so.

Three of them, seeing that Parker was apparently wholly unconscious of its approach, ran towards him and attempted to attract his attention by calling to him in a loud voice; but it seems clear now that the noise of the Wabash train prevented his hearing them. Plaintiff bases the right to recover on the grounds that defendant's trainmen on the construction train were running it at a high, unusual, dangerous and reckless rate of speed; that her husband was stooping, with his back to the west, when this train suddenly and without warning or signal by whistle or bell, was run over him; that it was racing with the Wabash train at the time.

There are a number of specific exceptions saved in the record, but it is plain that one question of controlling importance arises on this record. Were the trainmen operating the construction train that killed plaintiff fellow-servants of his, working for a common master in a common service, and if so is defendant liable for the injury? Learned counsel for defendant in his argument of this cause urged us to lay down some definite principle or rule by which employers could govern themselves. After a careful examination of this subject, in its varied aspects, we think the attempt would be futile and unsatisfactory. The judge or court who would deal in general observations outside of the record under consideration would be treading on dangerous ground, and in a very short time would probably find "himself hoisted by his own petard."

It is unnecessary to go over the learning and history of the rule that the master is not liable to his servant for the injury resulting from the negligence of a fellow-servant in the same common service. See *Ell v. Railroad*, 48 Eng. & Am. R. R. Cases, 318. An examination of the cases in this court will show that this court has never denied the rule. *McDermott v. Railroad*, 30 Mo. 115; *Rohback v. Railroad*, 43 Mo. 187;

*McGowan v. Railroad,* 61 Mo. 528; *Brothers v. Cartter,* 52 Mo. 372; *Gibson v. Railroad,* 46 Mo. 163; *Marshall v. Schricker,* 63 Mo. 308; *Smith v. Railroad,* 92 Mo. 359; *Sherrin v. Railroad,* 103 Mo. 378; *Murray v. Railroad,* 98 Mo. 573; *Relyea v. Railroad,* Supt. Ct. Mo., Feb. 1892; *Higgins v. Railroad,* 104 Mo. 413; *Schaub v. Railroad,* 106 Mo. 74.

The main and only difficulty has been to satisfactorily determine at all times whether the employment was a common service, and the employes fellow-servants within the meaning of the rule. And after due consideration we are of the opinion that, unsatisfactory as it may seem, the, rule itself must remain *general,* its application *specific,* as the cases arise. This rule, to exempt the master, requires the servants shall be employed by a common master, and the servants must be employed in the same common employment. In this case we have the first essential. The petition and evidence all show that plaintiff's husband and the trainmen on the construction train were employed by the same master, the defendant. Were they fellow-servants in a common employment?

The record shows plaintiff's husband was and had been for two years a section hand in defendant's employ, working on this section of defendant's railroad, repairing and keeping the track in a safe condition for trains. He was at this work tamping a rock under the block of the switch at the time he was killed.

The trainmen were in charge of a construction train, for three months had daily hauled rock from a crusher at Minnaville, five miles east of the point where Parker was killed, and unloaded it on this same section for the purpose also of ballasting the track to insure safety of trains passing over it.

It is in evidence, that this train made two trips daily over this section; that plaintiff's husband had

been engaged for two weeks near the place where he was killed; that this train passed the point where he was killed about the same time every afternoon about five o'clock.

These construction trains can only work between the schedule time of regular trains. It was in evidence that trackmen or section men were expected to look out for trains and clear the track. It was a rule of the defendant that whistles should be sounded in going around curves. That the work of deceased and the construction train crew tended to one common end, to-wit, the repairing and, in this instance, the ballasting of a common track on a common section, is unquestionable. One set of the employes were managing the train, hauling and unloading the crushed rock, and the other, the regular section men, were carefully disposing of this rock and tamping it under the rails and switches. Neither had the least control of the other; while they were working in harmony to accomplish a common purpose, the repairing and improvement of their employer's track on this section, neither could command or direct the other.

Again, they bore the same general relation to the master. That is to say, in repairing this track, they were both engaged in doing a work that the law devolved upon the defendant, and they were both engaged in assisting their common master in discharging a duty to the public and its trainmen who traveled in regular trains over this track.

This train passed every day about the hour of this unfortunate accident. Plaintiff's husband was familiar with the track and the curves. He had worked there two years. He also knew of the proximity of the Wabash road.

We believe it is conceded by all the courts, not those who follow the rule in the *Farwell case*, but those

who deny it, that the servant assumes the natural risks incident to the common course of the business, including the negligence of his fellow-servants. When plaintiff's husband went to work on the track that afternoon, he was certainly aware that this train would pull by him about the usual time to clear the track for the afternoon passenger train. In so doing, it would be following a regular or natural course. His work brought him to work on the same track, at the same time the work of the trainmen brought them there serving a common master. And both understood the risk from this necessary contact. And the negligence of the one in doing his work might injure the other in doing his work.

Hence, we conclude, that applying these facts to the general rule, they make a case of fellow-servants in a common employment. In *Rohback v. Railroad, supra,* the facts were, the plaintiff was a section man, at work on the defendant's railroad, at a place near the foot of Jefferson street, in Jefferson City, where the railroad crossed a street. While so employed, the trainmen in charge of the locomotive and train of cars, without ringing a bell, or sounding a whistle, ran the train over plaintiff. This court then held that the section men and the trainmen were *fellow-servants,* and plaintiff could not recover, though it was assumed *the negligence of the trainmen* was clearly shown, and the majority of this court still approve that case.

We are not aware that this court has ever repudiated that case. In *Whalen v. Railroad,* 8 Ohio St. 249, the facts were as follows: Plaintiff was a section hand, or trackman, working repairing the track. He alleged there was a man employed on one of defendant's trains whose duty it was to pass firewood from the tender to the engine, and, on finding sticks unsuitable, he cast the same from the train. That this train

was passing where plaintiff was at work on the track. He retired from the track, and, as the train passed, this fireman improperly threw a stick of wood from the tender; it struck plaintiff and put out his eye. That court said: "This case, it will be perceived, is not one in which the injured party is placed by their common employer in a position subordinate to and subject to orders of the fellow-servant through whose negligence and misconduct the injury occurs, so as to come within the principle decided in *Railroad v. Stevens*, 20 Ohio Rep. 415, and *Railroad v. Keary*, 3 Ohio St. 201; but presents the simple question whether the master or employer is liable to one servant for injuries received from the negligence of a fellow-servant, where no relation of subordination or subjection exists between them while engaged in the business of their common employer."

That court answered the question in the negative, holding the trackman and the fireman fellow-servants. This case is the more significant because it came from a court that first denied the rule in the *Farwell case*, in the cases cited by Judge NAPTON, in *McDermott v. Railroad, supra*.

In 1842, *Farwell v. Railroad*, 4 Metc. 49, was decided. In that case an engineer was injured by the negligence of a switchman, who left the switch open, and the engine was thereby run off the track. It was shown that the switchman was a careful and trustworthy servant. Farwell sued the company, and the supreme court of Massachusetts held he could not recover. That decision was subsequently followed by the supreme court of the United States in *Randall v. Railroad* (1883), 109 U. S. 482. In that case, the evidence showed the injury occurred at night, at a place where there was a network of tracks in the defendant's railroad yard, near the junction of a branch road with the main road, and about ten rods from a highway

crossing. Plaintiff had previously been employed on another part of the road. On the night in question, in the performance of his duty as a brakeman on a freight train, he unlocked a switch which enabled *his train* to pass from one track to another, and *he was stooping down,* with his lantern on the ground beside him, to unlock the ball of a second switch to let the engine of his train pass to a third track, when he was struck and injured by the tender of *another freight engine, in no way connected with his train, backing down on the second track.* From the evidence, it appeared the switch could be worked safely by a man standing midway between the two tracks, using reasonable care. It could not be safely worked by standing at the end of the handle while an engine was coming on the track next that end. The engine that struck plaintiff was being driven at a speed of about twelve miles an hour by an engine man in defendant's employ, and there was evidence that it had no light, except the headlight, and no bell, *and its whistle was not sounded.* A demurrer to the evidence was sustained.

Mr. Justice GRAY, in delivering the opinion of the court, said: "The general rule of law is now firmly established that one who enters the service of another takes upon himself the ordinary risks of the negligent acts of his fellow-servants in the course of the employment. This court has not hitherto had occasion to decide who are fellow-servants within the rule. \* \* \* Nor is it necessary for the purposes of this case to undertake to lay down a precise and exhaustive definition of the general rule in this respect, or to weigh conflicting views which have prevailed in the courts of the several states; *because persons standing in such a relation to one another as did this plaintiff and the engineman of the other train are fellow-servants,* according to the very great preponderance of judicial authority in

this country as well as the uniform course of decisions in the house of lords and in the English and Irish courts. * * *' They are employed and paid by the same master. *The duties of the two bring them to work at the same place at the same time,* so that the negligence of the one in doing his work may insure the other in doing his work. Their separate services have an immediate common object, the moving of the trains. Neither works under the order or control of the other. Each, by entering into his contract of service, takes the risk of the negligence of the other in performing his service; and neither can maintain an action for an injury caused by such negligence against their common master. The only cases cited * * * which have any tendency to support the opposite conclusion are the decisions * * * in *Chamberlain v. Railroad,* 11 Wis. 248, and * * *' *Haynes v. Railroad,* 3 Coldw. 222, each of which wholly rejects the doctrine of the master's exemption from liability to one servant for the negligence of another, and the first of which has been overruled * * *' in the same state. This action cannot, therefore, be maintained *for the negligence of the engine man in running his engine too fast, or in not giving notice of its approach.*"

This decision has never, so far as we can find, been questioned or overruled by the court rendering it. The subsequent case of *Railroad v. Ross,* 112 U. S. 377, though decided only a year later, does not mention it. Certainly it does not overrule it in terms; and we think the cases are not in conflict. They simply treat of the relation of the master to the servant under different conditions. In the *Ross case,* the supreme court of the United States *declined* "to lay down a rule which will determine, in all cases, what is to be deemed a common employment," but placed its decision on the ground that the "conductor, having the entire control and

management of a railway train, occupies a very different position from the brakeman, porters and other subordinates employed. He is in fact, and should be treated as, the personal representative of the corporation, for whose negligence it is responsible to *subordinate servants.*"

So that, while the learned judge who wrote that opinion discusses with marked ability what is now sometimes termed "the department rule," it seems not to have been the basis of the decision in that case. In the subsequent case in the same court of *Quebec S. S. Co. v. Merchant*, 10 Sup. Ct. (U. S.) Rep. 397, it appeared that the plaintiff was the stewardess of the ship. It was her duty to attend to the ladies' room in the cabin, and in the course of that duty to empty slops, as to which her orders were to throw them over the side of the vessel. The cabin was on deck. A railroad extended round the vessel, and consisted of four horizontal iron rods, which were supported by stanchions at intervals of four and one-half feet. In this railing there were openings or gangways for receiving and discharging freight and passengers. Three of the gangways were for passengers. On her voyage, at one of her stopping places, the gangway was opened to let off passengers. In replacing the rods, they were not placed in proper positions but remained so far unfastened that the hooks were not secured in the eyes. The carpenter and porter undertook to fasten the rods. The porter testified he told the carpenter of the ship to put the rods in, and he replied, "Wait until the rain is over." While in this condition, the plaintiff came to the gangway with a bucket of slops, leaned against the railing, it gave way, and she fell into the sea and was injured. The servants were divided into "three departments," the "deck department," the "engineer's

department" and the "steward's department." The carpenter was in the deck department, the plaintiff in the steward's; there was a master or captain in command of the whole vessel.

The court, Judge BLATCHFORD delivering the opinion, says: "The contention of the plaintiff is that, as the carpenter was in the deck department and the stewardess in the steward's department, those *were different departments* in such a sense that the carpenter was not a fellow-servant with the stewardess. But we think both the porter and the carpenter were fellow-servants with the plaintiff. The carpenter had no authority over the plaintiff, nor had the porter. The division into departments was one of convenience of administration. The case, therefore, falls within the well-settled rule, *as to which it is unnecessary to cite cases*, which exempts an employer from liability for injuries to a servant caused by another servant. * * * The plaintiff took upon herself the natural and ordinary risks incident to the performance of her duty, and among such risks was the negligence of the porter and the carpenter, or of either of them, in the course of the common employment. * * * There was nothing in the employment or service of the carpenter or the porter which made either of them any more the representative of the defendant than the employment and service of the stewardess made her such representative."

In *Murray v. Railroad*, 98 Mo. 573, this court held that the gripman of a cable car, employed upon it in operating it, was a fellow-servant of a watchman of the company whose duty it was, from his station on the ground, to keep watch of cars as they approach a curve and give signals to the gripman to prevent more than one train from passing the curves at a time. They were employed in the same "common employment of

operating the cars, one from the car, the other from his station on the ground." The learned judge, who wrote the opinion in that case, very clearly distinguishes those cases in this state in which it was the duty of the master to furnish reasonably safe instrumentalities for his servants, from those in which injury occurred by the act of a fellow-servant. He concludes by saying: " The majority of the courts, it is believed, hold that servants are in a common employment when they are engaged under the same master in the same general business." As in that case, the gripman and the watchman were engaged in the common employment of operating the train, so in this case the crew and men in charge of this construction train and the plaintiff's husband, and the section gang to which he belonged, were engaged in the common employment of repairing and making safe and secure the track of their employer, the defendant herein, on a common section.

So that, if we apply the general rule in this case, unquestionably they were fellow-servants, or if we apply "the department rule," as interpreted by the supreme court of the United States, in the *Randall case* and the *Quebec Steamship case, supra,* they are fellow-servants in the same department, that of the construction and repairing of the defendant's track on this section. But neither the general rule nor the rule requiring a consociation of the employes would justify the judgment in this case. These trainmen on the construction train were daily hauling and delivering stone on the section on which plaintiff's husband worked and had worked for three or four years. This train passed the working place of plaintiff's husband at least four times a day. He was required to get off the track for its passage each time. He could readily observe whether the engineer was in the habit of giving signals as he came and went, and whether he ran his engine so fast that it imperiled

the safety of the section hands. This construction train and the section men belong to the same department, that of construction and repair of the track. This train necessarily brought the work of the section and the construction crew daily in contact. So that this section gang could have observed and reported to the road master any dereliction of duty in this regard. As remarked by this court in *Marshall v. Schricker*, 63 Mo. 308: " It would be carrying the rule  *  *  *  to an absurd extreme to hold that those only are fellow-servants who are employed in doing precisely the same thing." The rule has never been circumscribed in any such a narrow circle.

We cannot think of any danger more obvious or likely to happen to a section man than the danger to be apprehended from irregular trains. It was the most ordinary incident to his employment. This seems to have been fully understood by the men. Plaintiff's witness Hudgens says: " All section men are expected to watch and get off the track when the trains come. Trains never stop to give us time to get off. We are expected to look out for all trains." And to the same effect is the evidence of Henry Hudgens, Joseph Dawson and M. J. Barry. The risk was one he assumed when he went to work on that section. We think the demurrer to the evidence should have been sustained. The court, having overruled the demurrer to the evidence, should have given defendant's fifth instruction. The evidence clearly made them fellow-servants, and it was the court's duty to declare the law. As this disposes of the case it is unnecessary to examine the other assignments of error.

SHERWOOD, P. J. and MACFARLANE, J., concur, and are of the opinion with myself that the judgment should be simply reversed, but in order to a disposition of the cause, and for that reason alone, we consent that the

case be remanded. Judge Sherwood in a concurring opinion, Black, J., in a separate opinion, holds the jugment should be reversed and the cause remanded. Barclay, Brace and Thomas, JJ., dissent.

Judge Thomas files a dissenting opinion in which Judge Brace concurs in the conclusions reached.

Barclay, J., dissents for reasons given by him in *Dixon v. Railroad, post,* p. 413, in division number 1, at this term.

The judgment is accordingly reversed and the cause remanded.

### SEPARATE CONCURRING OPINION.

Sherwood, C. J.—I have deemed it best to add a few observations respecting this case. If I employ hands to haul and distribute manure over my meadow, some to drive the team and unload the wagon, and others to distribute the manure when thrown out, and if while engaged in such work one of the hands engaged in distributing the manure should be run over by reason of the carelessness of the driver of the wagon and killed, I suppose no court in christendom would hesitate to say the hand run over and the driver of the wagon were *fellow-servants,* engaged in a common employment and serving a common master, and, therefore, that no recovery could be had against me.

I am entirely unable to distinguish in point of principle the hypothetical case from the one at bar; to note any appreciable difference between the common employment of hauling and distributing *stone* along the line of a railroad, and hauling and distributing *manure* upon a meadow.

The largeness or smallness of the area over which the given work progresses; the distances to be traveled or the amount of work to be performed, surely cannot

affect the principle involved or vary in any respect the legal conclusion to be drawn from the premises.

If the *farmer* in the case supposed should not be held liable, neither should the *railroad corporation* in the real one, unless it be declared as a matter of law that the law will exonerate the *farmer* from all liability in circumstances where it will hold the corporation responsible and guilty of actionable negligence.

### SEPARATE OPINION.

THOMAS, J.—My opinion is that Parker was not a fellow-servant of the conductor, engineer and members of the crew in charge of the construction train which caused his death. This position I know will be regarded by many as antagonizing principles of law, well established by the adjudged cases of this state and the other states of the Union as well as those of England. No one living has profounder respect for the ancient landmarks of the law than I have, and I hesitate long in refusing to follow precedents long recognized by the courts as sound. *Stare decisis* is a wholesome maxim, that ought not, in judicial investigation, to be disregarded, except for the most weighty considerations and cogent reasons. Private opinion and speculation should have no license to oppose themselves arbitrarily to established principles of jurisprudence. Innovations, whether introduced by legislative action, or judicial construction, tend to unsettle the law and make men feel insecure in their titles to property, and uncertain as to their legal rights. I have given the subject of fellow-service the fullest examination I was capable of, and the conclusion I have reached is not, in my humble opinion, in conflict with the adjudged cases in Missouri except the *Schaub case*, 106 Mo. 74, in which I concurred. In the *Schaub case* it was

held that the trainmen of one train were fellow-servants of the trainmen of another train. That case is not in line, according to the view I take of the subject, either with the letter or spirit of the previous decisions of this court, and it ought not, therefore, to be followed as authority.

Let us examine the history of the law of fellow-service as it has been evolved and developed, by judicial decisions, in Missouri. The first case in this state, in which the doctrine of fellow-service was discussed and announced, was *McDermott v. Railroad*, 30 Mo. 115, in 1860. That controversy grew out of the breaking down of the Gasconade bridge which created such widespread consternation among the people at the time. Plaintiff McDermott was a brakeman on the train that went down on account of the frailty of the bridge, as alleged. Judge NAPTON, who delivered the opinion of the court, laid down the broad doctrine, that a servant, who is injured by the negligence or misconduct of a fellow-servant, can maintain no action against the master for such injury, and that the rule should be " applied in all cases alike, without regard to the degrees of subordination, in which the different servants or agents may be placed, with reference to each other," and in support of this proposition Redfield on Railways, page 387, and *Farwell v. Railroad*, 4 Metc. 49, are cited.

In 1869 the *Rohback case*, 43 Mo. 187, was decided by Judge WAGNER, in which it was held that a track repairer and a trainman were fellow-servants, and the *McDermott case, supra; Priestly v. Fowler*, 3 Mees. & W. 1; *Murray v. Railroad*, 1 McM. 385, and *Farwell v. Railroad, supra,* were cited in support of the doctrine laid down. These are the foundation cases upon which the law of fellow-service was built in our state, up to the year 1869. Since that date the principles announced in the *McDermott case,* have like the baseless fabric of a

vision totally disappeared in the evolution and development of the common law of Missouri. There is not a vestige of them left. It is now universally recognized here and elsewhere, that the master must not only use reasonable care in furnishing his employes safe appliances, with which to perform their duties, but he must also use reasonable care in keeping them in repair and in safe condition. *Gutridge v. Railroad*, 105 Mo. 520, and 94 Mo. 468; *Parsons v. Railroad*, 94 Mo. 286; *Soeder v. Railroad*, 100 Mo. 673.

And it is equally well settled that the rule of fellow-service does not apply alike to all cases, without regard to the degrees of subordination in which the different servants or agents may be placed with reference to each other. *Moore v. Railroad*, 85 Mo. 588; *Mound City, etc., Co. v. Conlon*, 92 Mo. 221; *Stephens v. Railroad*, 96 Mo. 207.

That the courts, in the *Farwell, Murray, Priestly* and *McDermott cases*, started out with the proposition that all servants employed and paid by a common master in a common employment were fellow-servants without regard to gradations in authority, is evident from the language used in the opinions of the courts, and of the dissenting opinions in the *Murray case*. Judge NAPTON manifestly so understood it in the *McDermott case*, for he cited *Railroad v. Stevens*, 20 Ohio, 415, and *Railroad v. Keary*, 3 Ohio St. 201, as denying the principle of the *Farwell case*. The Ohio cases cited are in full accord with the later decisions of this court upon the doctrine of *respondeat superior*.

In the *Stevens case* the engineer, and in the *Keary case* a brakeman, was injured by the negligence of the conductor, and in both it was held that the conductor represented the corporation, and was its vice-principal, and that the corporation was, therefore, liable. This principle finds support in the adjudged cases in Ken-

tucky, *Railroad v. Moore*, 83 Ky. 675; in West
Virginia, *Madden v. Railroad*, 28 W. Va. 610; in Virginia, *Moon's Adm'r v. Railroad*, 78 Va. 745; *Railroad
v. Williams*, 9 S. E. Rep. 990, and *Johnson's Adm'x v.
Railroad*, 5 S. E. Rep. 707; in South Carolina, *Bootwright v. Railroad*, 21 S. C. 128; in Washington,
*Railroad v. O'Brien*, 21 Pac. Rep. 32, and in the supreme
court of the United States, *Railroad v. Ross*, 17 Am.
& Eng. R. R. Cases, 501.

It is very clear the rule in Missouri is, that where a
conductor has control and management of a train he is
not a fellow-servant of train hands placed under him.

What the common understanding of the bench and
bar as to the extent of the rule in the earlier cases was
appears again very fully from the opinions and dissenting opinions of these Ohio cases.

Judge WAGNER in the *Rohback case*, while following,
severely criticised the principle of the older cases, and
utterly failed to follow it afterwards in the cases of
*Devitt v. Railroad*, 50 Mo. 302; *Gibson v. Railroad*, 46
Mo. 163; *Brothers v. Cartter*, 52 Mo. 372; *Harper v.
Railroad*, 47 Mo. 567, and *Lewis, Adm'r, v. Railroad*,
59 Mo. 495, in its application to the condition of railway tracks and appliances and to servants' standing to
each other in the relation of superiors, with authority
to direct and control, and subordinates whose duty it is
to obey. The process of paring down and limiting the
broad rule, announced in the *McDermott case*, has continued in this court up to date, and the doctrine that
servants cannot recover for injuries resulting from defective appliances, and that all the servants of a corporation
are fellow-servants without regard to subordination is
now utterly repudiated without dissent. The principle
of fellow-service is, however, still recognized and firmly
fixed in our law. A servant cannot recover for an
injury inflicted upon him by the negligence of a fellow-

servant. Who, then, is a fellow-servant? No definition of fellow-service can be laid down that may not be subject to criticism, indeed, that is not subject to criticism, and be difficult of application. Men, employed and paid by a common master, to perform a common service, are said to be fellow-servants. But this definition would make all the employes of a great railway corporation, owning thousands of miles of road, extending into and through many states, fellow-servants. No court now gives the rule any such broad signification.

A few years ago in Missouri all employes of a common master, engaged in a common employment, who had no authority to hire and discharge hands, were held to be fellow-servants. *Stoddard v. Railroad*, 65 Mo. 514; *Brothers v. Cartter, supra; Marshall v. Schricker*, 63 Mo. 308. Then the rule was modified so as to exclude, from the common service, those who were clothed with authority to direct and control the movements of men placed under them. *Moore v. Railroad, supra; Dayharsh v. Railroad*, 103 Mo. 570. Then finally came the decision in the *Sullivan case* in 1888, 97 Mo. 113, in which it was announced that a track-walker on a railroad is not a fellow-servant of a locomotive engineer or fireman of a passenger train. This, I take it, in effect, though not in terms, overrules the *Rohback case*, and in the determination of the question now under review we must affirm the doctrine of the *Sullivan case*, or overrule it, and go back to the principle announced in the *Rohback case*. This alternative being presented, I feel at liberty to resort to general principles and reason to guide me in determining what my duty is in the premises. I find two deliverances of this court upon the question, which to my mind are in direct conflict with each other, and I choose to follow the last, and in doing so I do not deem that I am disregarding the maxim, *stare decisis*. I regard the

*Sullivan case* as in line with the spirit and tendency of the development and evolution of the law of fellow-service in Missouri, and in many other states of this Union, and to overrule it now, and return to the doctrine of the *Rohback case*, would be taking a step in the wrong direction.   As I have shown the foundation (*McDermott case*), upon which the *Rohback case* was based, has been wholly removed, and it seems that the superstructure ought to go with its foundation. When I say the principles of the *McDermott case* have been repudiated I mean, of course, all of it that is not *obiter dictum*.

The *Rohback case* being founded on the *McDermott, Farwell, Priestly* and *Murray cases*, it becomes important and appropriate to examine and see what was in fact decided.   *Priestly v. Fowler* was decided by the court of exchequer of England in 1837, and is the first case to be found in the English books, where the limitation of the liability of the master for the negligent acts of his servant is even hinted at.   The action grew out of an injury resulting from the negligent overloading of a van by another servant.   Chief Baron ABINGER, *arguendo*, said:   "There is no precedent for the present action by a servant against a master.   We are, therefore, to decide the question upon general principles, and in doing so we are at liberty to look at the consequences of a decision the one way or the other."   With a view to the actual state of English society and the state of labor at that time, he concluded that to hold the master liable for the injuries of one servant by the negligence of another would lead to alarming consequences.   The argument of Lord ABINGER is characterized in a note to Redfield's work on Railways [6 Ed.] page 566, as the most ingenious attempt "at *reductio ad absurdum* upon the subject of fellow-service in supposing, among other speculations, some fearful conse-

quences if the master were to be held liable for the negligence of the chamber-maid in putting another servant into wet sheets.'' But in that case both servants were on the van working together with no common superior servant over them, and, hence, that cannot be taken as a precedent that all servants of a common master in a common employment are fellow-servants, and it is very questionable if nine-tenths of the courts of to-day would not hold the master liable in such case, upon the well-recognized and familiar principle, that the master is required to furnish the servant a safe place to work, especially when it was alleged and proved that the master knew the van was overloaded.

The next case decided was *Murray v. Railroad*, *supra*, in 1841. There it was held that the second foreman was a fellow-servant of the engineer. This case and the *Farwell case*, where the engineer was injured by the negligence of his fireman, are in line with an almost unbroken current of authority. In both cases the men worked under a common superior, the conductor, and were engaged in the *joint* performance of the same service. All else that was said by the judges in those cases was *obiter dicta*, and we are not bound to follow them, unless their reasoning is satisfactory to us. In other words as to *obiter dicta* we are at perfect liberty to examine the foundations upon which they stand, and if they are found to be unsound or unsafe, and not in accord with the eternal fitness of things, to repudiate them. I will not go into an examination of the reasons of the rule laid down in the *Priestly*, *Murray*, *Farwell* and *McDermott cases*, for I find the subject so exhaustively discussed in the dissenting opinions of the judges in the *Murray case*, and the opinions of the court in the case of *Railroad v. Keary*, *supra*, and the opinion of Lord COCKBURN in *Dixon v.*

*Rankin,* 1 Am. & Eng. R. R. Cases, 569, that I am not able, and, therefore, not disposed, to attempt to add anything by way of argument or illustration to what they have said.   But if their logic and reasoning, upon the state of labor fifty years ago, were so cogent and conclusive, with how much more force, will they apply now, when we find labor divided and systematized as it never was before, and when not only capital but industries are centralized to an extent not dreamed of a few short years ago.   Labor is not only divided and organized, but the laborers are also organized.   Every man has his place and his sphere, not fixed alone by the master but by the joint action of master and servant. The large factories and railway corporations could not transact business except upon the plan of gradations in service, and a strict enforcement of obedience by subordinates to the orders of their superiors.   This obedience is given unquestioned.

The movements of the thousand employes of the great railway systems are carried on with the regularity and precision of the maneuvers of an army, and an employe would no more undertake to discuss the propriety of an order with his superior, than a private would that of his captain in the midst of battle.   He must yield unquestioned obedience at once, or quit the service.   Indeed, such business could proceed upon no other theory.   "In the progress of society, and the general substitution of ideal and invisible masters and employers for the actual and visible ones of former times, in the forms of corporations engaged in varied, detached and widespread operations   *   *   *   it has been seen and felt that the universal application of the rule" (the rule in regard to fellow-service) "often resulted in hardship and injustice.   Accordingly, the tendency of the more modern authorities appears to be in the direction of such a modification and limita-

tion of the rule as shall eventually devolve upon the employer under these circumstances a due and just share of the responsibility of the lives and limbs of the persons in its employ." *Gilmore v. Railroad,* 18 Fed. Rep. 866.

In the case of *Railroad v. Collins,* 2 Duv. 114, which involved the identical question decided in the *Sullivan case,* the court of appeals of Kentucky, per Chief Justice ROBERTSON, said: "We cannot admit that the appellee's relation as an employe in its service should exempt the corporation from that general liability, as it might, perhaps, do by the application of a recent rule, adjudged in England with some exceptions, and echoed with still more exceptions by a few American courts. But this anomalous rule, even as sometimes qualified, is, in our opinion, inconsistent with principle, analogy and public policy, and is unsupported by any good or consistent reason. In the use and control of the engine the engineer is the chief and governing agent of the corporation, and all his associates *in that employment* are employes in '*a common service.*' Neither of these subordinates under his control is, *as between themselves,* an agent of the railway company; and, therefore, *it* is not responsible for any damage done by one of them to another while in its service; and, so far, the British rule has foundation in both reason and analogy; but beyond this it is baseless of any other support than a falsely assumed public policy or implied contract."

And, speaking of the relation that section men sustain towards trainmen, the court adds, "They are, therefore, not in the essential sense of contradistinctive classification '*in the same service*' with the engineer and his running co-operators, who act in a different sphere, and constitute a distinct class; consequently, neither of the assumed reasons for the British rule, as to

·employes 'in the *same* service,' can be in any way consistently applied as between the engineer and such common laborers as the appellee; and the apparent extension of the rule to them may be deemed inadvertent, or not carefully and logically considered with rational discrimination and precision. We, therefore, can neither feel the *rationale*, nor acknowledge the authority, of the crude and self-contradictory decisions, or loose and incongruous *dicta*, referred to on that subject; but to harmonize the law we must recognize a more congenial principle of normal vitality, and adjudge, as we do now, that the appellee, in his humble and isolated employment, should be treated as a stranger to the engine as a motive power." * * *

Mr. Redfield, in a note to this case, says: "We have felt that the opinion is altogether entirely sound in its principles, and maintained with very uncommon ability in its logic, as well as its illustrations, both of which seem altogether unexceptionable." * * * And in a note to the discussion of the *Collins case*, in Redfield's work on Railways [6 Ed.] page 570, it is added: "But the profession should be warned that the decisions on the other side embrace a very large number of the best-considered English cases, and an almost equal number in the American states; including all, so far as we know, with the exception of Ohio, Georgia and Kentucky. And the decisions in these latter states are all placed on peculiar grounds, thereby virtual' confessing the soundness of the general rule, that cannot recover of his employer for an injury i through the want of care in a fellow-servant in the same department of the master's b under the same general control. The c mistake or misapprehension, on this many courts into conclusions great reason and the common instinct

reasonableness and justice of this construction may, it is to be hoped, induce its universal adoption at no distant day."

And as late as 1888, in *Railroad v. Ackley*, 87 Ky. 278, the court of appeals of Kentucky held that an engineer of a passenger train and those in charge of a freight train were not fellow-servants.

In *Railroad v. Kelly*, 127 Ill. 637, it was held that a section hand and those in charge of a construction train were not fellow-servants. The court there said: "What co-operation was there at the time of the injury, it may be asked, between Kelly, who was working as a section hand, under the direction of a section boss, and the conductor and engineer of the construction train? None, whatever; and yet it is claimed they were fellow-servants. * * * Under the facts shown in evidence we think it plain that Kelly was not a fellow-servant with those in charge of the construction train."

In *Railroad v. Carroll, Adm'r,* 6 Heisk. 347, the supreme court of Tennessee held that a section foreman is not a fellow-servant of men in charge of a train of cars. In *Calvo v. Railroad*, 23 S. C. 526, it was held that a railway locomotive engineer and a section master of track repairers are not fellow-servants within the rule as to the master's liability for injury by one servant to another.

In *Railroad v, Moranda*, 108 Ill. 580, where the plaintiff, who had charge of the section of a road, was ┄ed by a piece of coal falling from a passing train, ┄reme court of Illinois said: "In the former ┄this case we held that, in order to constitute ┄the same master 'fellow-servants' within ┄*leat superior*, it is not enough they are ┄ parts of the same work, or in the ┄nterprise carried on by the master,

not requiring co-operation, nor bringing the servants together or into such personal relations that they can exercise an influence upon each other promotive of proper caution in respect of their mutual safety; but it is essential that they shall be, at the time of the injury, directly co-operating with each other in the particular business in hand, or that their usual duties shall bring them into habitual consociation, so that they may exercise an influence upon each other promotive of proper caution.     We feel constrained to adhere to this ruling.''

In *Cooper v. Mullins*, 76 Am. Dec. 638, the supreme court of Georgia said: ''In this case, the person whose negligence produced the injury was on one train of cars, and the person who was injured was on another train, and had not the slightest possible opportunity of preventing the other's carelessness.     To hold the employes on different trains of cars responsible for the carefulness of each other seems to me about as reasonable as it would be to exact such a mutual responsibility between employes on different railroads, or in different quarters of the earth, because they might happen to be all servants of the same master.''     In *Hobson v. Railroad*, 28 Am. & Eng. R. R. Cases, 360, the supreme court of Arizona held that ''a teamster who hauls ties in the construction of a railroad is not consociated with the engine-driver of a train on which the workmen ride to dinner, so as to defeat his recovery against the common master for injuries caused by negligence of said engine-driver.''

In *Madden v. Railroad, supra,* the supreme court of West Virginia held that a railway company is liable for the death of the engineer on one train, caused by the negligence of its conductor on another train.

The circuit court of the United States for Vermont, in 1890, in *Howard v. Canal Co.*, 40 Fed. Rep. 195, held that trackmen and trainmen are not fellow-servants, saying: "Trackmen are no more co-laborers with trainmen than the trainmen of one train are with those of another train on the same road, and not so much so as trainmen of the same train are. Those in charge of this train were placed there and clothed with authority by the defendant. They acted for the defendant in the exercise of the control given them over the movements of the train; and their negligence in that behalf appears * * * to be the negligence of the defendant."

In *Railroad v. Ross, supra*, it was held that the engineer and the conductor of a train were not fellow-servants. Justice FIELD, who delivered the opinion of the majority of the court, after reviewing the English cases in regard to the subject, said: "But, notwithstanding the number and weight of such decisions, there are, in this country, many adjudications of courts of great learning, restricting the exemption to cases where the fellow-servants are engaged in the same department, and act under the same immediate direction; and, holding that within the reason and principle of the doctrine, only such servants can be considered as engaged in the same common employment." Thus, it will be seen that the *Sullivan case* finds support in the courts of the United States, Kentucky, Georgia, Illinois, Arizona and West Virginia. It is in line, also, with the *Barry case*, 98 Mo. 62, where it was held by this court that the engineer of a freight train was not a fellow-servant of section men. Nor do I regard the *Murray case*, 98 Mo. 573, as in conflict with it. Murray was aiding the gripman in running the cable car, and in its operations and movements, at the point of the accident, evidently ranked the latter in authority. And I think there is a marked distinction to be taken between

the *Sullivan case* and the case at bar and that class of cases, of which *Steamship Co. v. Merchant*, 10 Sup. Ct. Rep. 397, is a type, where the master, his foremen and subordinates are all present and consociated in the performance of general work on board a ship, or in one building or one locality.

II.  I know an attempt is made to distinguish the *Schaub case* from the *Sullivan case*, but to my mind the distinction tendered is without a difference in principle.  The embarrassment the courts encounter in the discussion of the law of fellow-service grows out of the difficulty in adopting and adhering to some general principle upon which to proceed.  When the principle announced in the earlier cases—that all servants employed and paid by the common master to perform common service were fellow-servants—was abandoned, the courts were left apparently with no sound principle by which they could be guided and controlled in concrete cases; and the tendency has been steadily to abrogate the rule of fellow-service by the limitation of its application and introducing exceptions to it.

Let us examine the *Sullivan case*, and see if we can deduce a sound principle from it which can be applied in cases involving injuries resulting to servants from the negligence of other servants, employed by the same master to manage one general business.

It is settled law that if a servant, representing his master or standing in his stead and being his *alter ego*, injure another servant of the same master in the performance of the same work, the master is liable upon the principle of *respondeat superior*, and the maxim, *Qui facit per alium facit per se*.  A laborer is sent to drive a spike to make firm a rail on the railroad, or to fasten a handhold on a freight car, and it is held that his hand in driving the spike or fastening the handhold is the master's hand, upon the principle that the master

must furnish a clear track and safe appliances for
its servants. The act of the laborer is imputed to
the foreman and through him to the master. So it has
been held that one having authority to direct and
control men under him represents the master, and the
latter is liable for his negligent acts.

Sullivan was a track-walker, and was killed by the
negligence of the employes in charge of a passenger
train. It was held they were not fellow-servants.
Upon what theory? Upon the theory alone that the
conductor and those employed with him in running the
train represented the master and stood in his stead.
It is said Sullivan's duty was to keep the track clear,
and hence he was not performing the same *kind* of work
the trainmen were performing. He and the trainmen
were engaged in the same general work, that is, in
operating traffic on a railroad. He kept the track clear
while the trainmen ran the train on that same track.
They were all employed and paid by the same master
to aid in carrying on commerce on the same road,
and, hence, it is illogical to predicate a right to recover
in such case upon the ground that Sullivan and the
trainmen were engaged in the performance of *different*
kinds of work. The trainmen were under the con-
ductor as their immediate superior, and Sullivan was
under the section foreman as his immediate superior.
The conductor represented the corporation in running
the train, and in contemplation of law it was present in
the person of the conductor. The section foreman,
on the other hand, represented the corporation in keep-
ing the track clear and in suitable condition for the
safe movement of the train. Hence, the trainmen and
section men were not fellow-servants, not because they
performed *different* work, but because they performed
distinct parts of the same work in different groups,
under different foremen. They looked to different

individuals for directions in their work.   They had no *common* immediate superior to whom they could look or appeal, if need be, for protection.   They had no control of each other.   They were not consociated in the performance of their duties.   So in the case at bar Parker worked under the immediate direction of the section foreman, and the construction train was operated under the immediate direction of a conductor.   Parker was required to obey the directions of the section foreman, and the trainmen were required to obey the conductor.   They had *no common* immediate superior or from whom to receive directions for their work.   One group of men was subject to one independent will, while the other group was subject to another independent will.   I do not mean that these groups of men were independent of the common master, but simply that they were independent of each other.

It is true the train was hauling material for the section men to use in constructing the roadbed.   The train was, however, being operated on the road, and I cannot see why the trainmen's relation to the section men could be changed, simply by what the former hauled.   Such a distinction is arbitrary and artificial, and hence unsatisfactory.   What did Parker know about the skill of the engineer or conductor in charge of the construction train?   What right had he to inquire into the operation of that train?   He and those in charge of that train were in no proper sense consociated in the performance of their respective duties.

I am fully conscious that ample authority can be found to sustain the position directly contradictory of the one here maintained, but finding a conflict of opinions I prefer to follow that line that more fully accords with my conceptions of justice, and the best interests of society, and employers and employes, and now after another qu. ter of a century of criticism and

discussion in my own state and elsewhere of the law of fellow-service, and of the reasons upon which it rests or ought to rest, I quote and heartily indorse the eloquent language of Chief Justice ROBERTSON in the *Collins case, supra*, where he says the rule announced "is the only doctrine we can recognize as consistent with the enlightened and homogeneous jurisprudence of this clearer day of its ripening maturity; and, looking through the mist of the adjudged cases and elementary *dicta*, we can see no other fundamental principle which can mould them into a consistent or abiding form."

I stand squarely by the *Sullivan case*, and do not hesitate to apply the principle there announced to the facts of this case, and hold that Parker was not a fellow-servant of those in charge of the construction train.

I think the case was well tried, and the judgment ought to be affirmed. BRACE, J., concurs in the conclusion, and all that part of this opinion that treats of the principle announced in the *Sullivan case*.

### SEPARATE OPINION.

BLACK, J.—I find myself unable to agree to all that is said in either of the opinions just filed, and, hence, the following observations: We all agree, I believe, that the rule which exempts the master from liability to one servant for the negligent act of a fellow-servant prevails in this state. The real question, therefore, is, whether the deceased track repairer was a fellow-servant with those persons engaged in operating a rock train, within the meaning of the rule of exemption. That rule, as declared in the *Farwell case*, was, in substance, this: That the master is not liable for injuries sustained by one employe, by reason of

the negligence of a co-employe, and all persons are co-employes who are engaged in the prosecution of the same general business, and this, too, without regard to rank or station.

We believe it is conceded on all hands that, notwithstanding this rule, there are certain duties, personal to the master, and, for the non-performance of which, resulting in an injury, he is liable, even to a servant. Thus he must observe due care in furnishing suitable machinery and appliances; in seeing that the machinery and appliances are kept in repair; in the selection of competent and trustworthy servants; in making suitable rules and regulations for the conduct of a complex business; and he must see that youthful persons receive proper warning. It is often said that the servant, intrusted with the performance of these duties, personal to the master, is not a fellow-servant with those engaged in the prosecution of other work; but such statements are misleading, and have been the source of much trouble. The master is liable for a negligent performance of these duties, no matter by or through whom he undertakes to perform them. It is, therefore, evident that the question as to who are fellow-servants, within the rule of exemption, cannot be determined from expressions found in those cases which have to deal with some default, or alleged default, of the master in the performance of some personal duty.

The broad and sweeping rule of the *Farwell case* was adopted in many of the states. It had but little more than been approved, when courts and legislatures began the process of cutting it down, because of the gross injustice which it worked out in its application to the great enterprises of the day. This is clearly shown by the constant enlargement of the field of duties held to be personal to the master. Again, it is held in this

and other states, in direct opposition to the rule as laid down in the *Farwell case*, that when the master delegates to an employe the power to manage, direct and control men in the performance of their work, such person is a vice-principal or representative of the master, and the master is liable to an under servant for the negligent acts of this representative. But the servants, under this representative, may be co-servants with those under another representative of the same master. Thus, the persons engaged in and about machine shops, foundries and the like are often strictly fellow-servants, though under and subject to the orders of different foremen.

It must be apparent that cases like those before mentioned, whether founded on the non-performance of some personal duty or the negligent act of a vice-principal, do not dispose of the question now in hand. They point out the growth of the law, and furnish some aid in determining who are fellow-servants within the rule of exemption, but do not furnish any exact or reliable guide. To determine who are co-servants within that rule, it may be well to recall the ground upon which it is based, which is, in substance, this: That from considerations of public policy and convenience the law will imply a contract on the part of the employe to take upon himself all risks arising from the negligent acts of his co-employes. The reasons for the rule are: "Where several persons are employed in the conduct of one common enterprise or undertaking, and the safety of each depends, to a great extent, on the care and skill with which each shall perform his appropriate duty, each is an observer of the conduct of the other, can give notice of any misconduct in capacity or neglect of duty, and leave the service if the common employer will not take such precautions and employ

such agents as the safety of the whole party may require."

Now, it being conceded, as it must be, that the master is liable to third persons for the negligent acts of his servants, it is difficult to see how public policy has much to do with the question as to who shall be deemed fellow-servants within the rule of exemption. The liability being admitted in case a third person is injured, but denied in case a servant is injured by another servant, the denial in the latter case must stand on some peculiar relation between master and servant. This peculiar relation cannot be simply the fact that the servants are in a position where one may be injured by the negligence of another, for third persons often occupy the same position; as where they become passengers. The real and only point of distinction, it seems to us, arises out of the fact that the servants are so associated and related in the performance of their work that they can observe and influence each other's conduct, and report any delinquency to a correcting power. To say a clerk engaged in an office making out pay rolls for a railroad company is a fellow-servant, within the rule of exemption, with those engaged in operating trains is out of all reason. Guided by the real reason for the rule it seems to us it should be applied and applied only in those cases where the servant injured and the one inflicting the injuries are so associated and related in their work that they can observe and have an influence over each other's conduct, and can report delinquencies to a common correcting power or head. In short they should be fellow-servants in fact, and not simply in dialectic theory. If in separate and distinct departments, so that the circumstances just stated do not and cannot exist, then they are not fellow-servants within any just or fair meaning of the rule. This conclusion, though

not in strict accord with the majority of the adjudged cases, is, it is believed, within the true and only reason for the rule, and has the support of many cases, some of which go much further than has been indicated. The following are some of the cases: *Railroad v. Carroll, Adm'r*, 6 Heisk. 347; *Railroad v. Weaver*, 35 Kan. 412; *Railroad v. Morando, Adm'x*, 93 Ill. 302. On this question the closing observations of Justice PAXSON in *Railroad v. Bell*, 112 Pa. St. 400, may be consulted. The real point in judgment in *Railroad v. Ross*, 112 U. S. 377, was that a conductor, who has charge of a train, with the power to direct its movements, represents the company, and in the performance of such duties is not a fellow-servant with the engineer and other operatives on the train, within the rule of exemption. Some observations made in that case support our conclusion. That Justice MILLER so understood that case is evident from what he said in *Garrahy v. Railroad*, 25 Fed. Rep. 258.

The deceased was one of a gang of five track repairers, all under a foreman. The rock train and the thirty men operating it were all under the command of a conductor. The evidence tends to show, in an incidental way, that the deceased and his gang had nothing to do with loading or unloading the rock train, and were not subject to the orders of the conductor, but were under the control of their own foreman or boss, and that this boss had no control over the rock train men. In short the evidence tends to show that the two gangs were entirely independent of each other, both as to the work which they performed, and as to the supervising power over them. If these are the facts, then applying the conclusion before stated the deceased and the man employed in operating the rock train were not fellow-servants within the rule of exemption. *Prima facie*, they were all fellow-servants within

that rule, and it devolved upon the plaintiff to disclose a state of facts which takes Parker out of it. Those facts should be found by the jury. The instructions do assume the existence of some of these facts, but that will not do. Indeed, the case does not appear to have been tried with a view of showing that these gangs were independent of each other. For these reasons the judgment should be reversed and the cause remanded for new trial.

I do not regard the conclusion before expressed as in conflict with prior cases in this court, when we come to look at the facts in judgment. In *Rohback v. Railroad*, 43 Mo. 187, it appears the men were all at work at the same yard, and, for aught that appears, were under the same foreman, and in constant association. The question considered in *Marshall v. Schricker*, 63 Mo. 308, was whether Clifford occupied the position of a vice-principal. So far as that case has any direct bearing upon the question in hand, it seems to amount to a recognition of much that we have here said; for it is there said: "Nor was he engaged in a distinct department of the general service, and, therefore, a stranger to the service in which the plaintiff was engaged," and the department doctrine finds recognition in other portions of the opinion in that case.

What we have said is also in perfect accord with *Murray v. Railroad*, 98 Mo. 573, for there the negligent servant and injured servant were strictly fellow-servants. This case is also unlike that of *Miller v. Railroad, ante*, p. 350, for there it was part of the duty of the track repairers to unload the gravel train, and these two gangs of men joined in their work for the purpose of unloading the cars; not so in the case in hand, so far.

Nor in my opinion is this case at all like the case where different crews are engaged in operating trains

on the same line of road under orders from a common train dispatcher.

Should the judgment be for the plaintiff, the damages will be the sum of $5,000, because the case, if any the plaintiff has, comes under the second section of the damage act. *Sullivan v. Railroad*, 97 Mo. 114; *Miller v. Railroad, supra.*

### SEPARATE OPINION.

BARCLAY, J.—In *Dixon v. Railroad, post*, p. 413, in division number 1, my views of some phases of the subject governing the case at bar were given. It is unnecessary to repeat what was then said.

The present case comes closer than that did to the doubtful line, but yet appears to me to involve the same principles then touched upon. My brother BLACK has formulated them with vigor and clearness in his opinion here. My only difference now from him is that, in my judgment, those principles point plainly to an affirmance instead of a reversal. His summary of the evidence, as well as the instructions asked by defendant, and its statement and brief in this court, indicates that the facts, bearing upon the issue of fellow-service, are entirely undisputed. Hence, the court may properly pass upon that issue as one of law only, as it did in the trial court, and, in my opinion, correctly.

That course was followed in *Garrahy v. Railroad* (1885), 25 Fed. Rep. 258, a case which arose in Missouri, though tried in Kansas, which Mr. Justice MILLER approved after full consideration.

Moreover, as to that phase of the case, such action, on the part of the court, is but the application of a very familiar principle, governing the exercise of the respective functions of court and jury.

Applying to the conceded facts the rules of law stated by Brother BLACK, it seems to me that the judgment should be affirmed.